IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAIʻI

| | |
|---|---|
| LYNELL TOKUDA, individually and as personal representative of the Estate of Richard Ernest Louis, RICHARD C. LOUIS, DERRICK LOUIS, KEVIN LOUIS,<br><br>        Plaintiff,<br><br>  vs.<br><br>CHRIS CALIO; HENRY BARRIGA; SHERWIN PEREZ; COUNTY OF KAUAI, DOE DEFENDANTS 1-50, and DOE ENTITIES 1-10,<br><br>        Defendants. | CIVIL NO. 13-00202 DKW-BMK<br><br>**ORDER (1) GRANTING IN PART AND DENYING IN PART CHRIS CALIO'S MOTION FOR SUMMARY JUDGMENT AND (2) GRANTING COUNTY OF KAUAI'S MOTION FOR SUMMARY JUDGMENT** |

<u>**ORDER (1) GRANTING IN PART AND DENYING IN PART CHRIS CALIO'S MOTION FOR SUMMARY JUDGMENT AND (2) GRANTING COUNTY OF KAUAI'S MOTION FOR SUMMARY JUDGMENT**</u>

<u>**INTRODUCTION**</u>

On February 15, 2012, Kauai Police Department Officer Chris Calio shot

and killed sixty-two year-old Kauai resident Richard Louis on the roof of Louis'

home while attempting to execute an arrest warrant. Louis' estate and surviving

children bring claims against Calio and the County of Kauai for violations of state and federal law. Because questions of fact remain regarding the circumstances of the shooting, Calio's motion for summary judgment is denied with respect to the Section 1983 Fourth Amendment excessive force claim against him in his individual capacity. No such questions, however, remain with regard to the Louis family's other claims against Calio or with regard to the claims against the County of Kauai, and summary judgment on these claims is therefore entered in defendants' favor.

## BACKGROUND

### I.      February 15, 2012 Incident

On February 15, 2012, members of the Kauai Police Department ("KPD"), including Sergeant Calio, participated in a Hawaii Fugitive Task Force ("HFTF") operation to apprehend Louis, a felon with an outstanding warrant. Calio Decl. ¶¶ 3, 4, 6; Kalima Decl. ¶¶ 3, 4. During a pre-operation briefing, Calio was advised that Louis had been evading police since December 2011. Calio Decl. ¶ 7. Sixty-two year-old Louis was wanted for failure to appear for a Fifth Circuit Court proceeding on December 5, 2011, related to criminal charges that included

theft and firearms, ammunition, and drug violations. First Amended Complaint ("FAC") ¶¶ 13, 55; Calio Decl. ¶ 6.

Upon HFTF's arrival at Louis' residence, KPD Officer Paris Resinto attempted to negotiate his surrender. Louis, however, refused to submit and remained inside the house with his girlfriend, Emily Fontanilla. Calio Decl. ¶ 10; FAC ¶¶ 22-25. Plaintiffs allege that at approximately 4:20 p.m., Officer Resinto persuaded Fontanilla to exit the house. At some point during Officer Resinto's negotiations with Fontanilla, KPD Acting Assistant Chief Sherwin Perez arrived on scene and activated KPD's Special Services Team ("SST"), led by KPD Lieutenant Michael Gordon. Perez also informed KPD Lieutenant Eric Shibuya, the head of the HFTF, that the plan was to wait Louis out. FAC ¶¶ 26-28.

According to Plaintiffs, around 4:30 p.m., KPD Captain Henry Barriga arrived, and after setting up logistical support, assumed the Incident Commander role from Perez. At approximately 5:16 p.m., Barriga ordered the KPD SST to enter Louis' residence. FAC ¶¶ 29-48.

In response, Louis emerged and jumped onto the top of roofed dog kennels located at the rear, eastern side of the property, barefoot and clothed only in corduroy shorts. Calio Decl. ¶ 11; FAC ¶ 56. According to Calio, he saw Louis

leap from the roof of the south building onto the top of the dog kennels, pick up metal cages, and throw the cages down toward officers standing on the ground below him. Calio claims that Louis had an angry and violent facial expression and was screaming at the officers, who were yelling back at him, "Dickey, give up." Calio Decl. ¶¶ 11-17.

Calio also yelled at Louis to stop. When Louis did not do so, Calio climbed onto the roof of the south building from the east side, and started moving toward Louis, who ran in the opposite direction toward the west. Calio then saw Louis pick up a bamboo pole with both hands, with his back towards Calio. Although Calio yelled "police" and "drop it," Louis ignored his commands, and threw the bamboo pole like a spear down toward the road where law enforcement officers were located. Calio Decl. ¶¶ 19-25.

Then, according to Calio, Louis turned with an "angry and violent look on his face." Calio Decl. ¶ 26. Louis moved toward Calio and picked up a metal can, holding it in his left hand while reaching into it with his right. Calio stopped advancing as he observed Louis pulling something with a handle out of the can. Louis then charged toward Calio, who attempted to back up. Calio saw Louis pull his right hand out of the can as nails flew out. He saw what appeared to be a

"metal object in the shape of a hammer" in Louis' right hand.   Calio Decl. ¶¶ 27-37.   Calio claims that Louis raised the hammer "as if to either throw the hammer at me or strike me with it," while quickly closing the distance between them.   Calio Decl. ¶¶ 37-38.

Fearing that he would fall as he attempted to retreat, Calio yelled to Louis twice, "drop it, drop it now."   Calio Decl. ¶¶ 40-41.   Calio claims that Louis yelled back at him, "I going to fucking kill you."   Calio Decl. ¶ 42.   Fearing for his life, and believing that he was going to be struck in the face or head with the hammer, Calio unholstered and drew his firearm with his right hand.   Calio Decl. ¶ 43.   He fired his service weapon at hip level as Louis charged toward him, until Louis dropped six feet short of reaching him.   Calio Decl. ¶¶ 44-45.

Numerous law enforcement officers at the scene saw Louis on the roof before he was shot by Calio.   According to Eric Kalima, Deputy United States Marshal, he yelled, "don't move," after he saw Louis climb onto the roof near the south end of the residence.   Kalima Decl. ¶¶ 5-7.   Like Calio, Kalima observed Louis pick up a metal cage and throw it down at officers on the south side of the property, while yelling obscenities at them.   Kalima Decl. ¶¶ 9-11.   As Louis ran toward the west side of the roof, Kalima mirrored his movements on the ground.

Kalima Decl. ¶¶ 14-15.   Kalima claims to have seen Louis with a hammer in his right hand, raised above his head in a cocked back position, as Louis ran toward Calio.   Kalima Decl. ¶¶ 17-19. According to Kalima, he then saw Louis throw the hammer at Calio, as Calio fired his weapon.   Kalima Decl. ¶¶ 20-21.

Another KPD officer, Daniel Oliveira, climbed onto the roof shortly before Louis was shot.   While on the ground, Oliveira heard Louis yelling "something about kill me, killing."   As he climbed onto the roof, Oliveira observed Calio retreating backward.   Oliveira did not see Louis holding or throwing a hammer or any other object prior to Calio discharging his firearm, stopping Louis in his tracks. Ex. 2 attached to Calio Reply; Plaintiffs' Ex. 11. (2/21/12 Oliveira Statement).

Several non-law enforcement witnesses also observed the incident.   Louis' neighbor, Rose Koerte, saw Louis throw the bamboo poles off the roof in the direction of law enforcement officers on the ground.   According to Koerte, after he did so, Louis did not have anything in his hands prior to multiple gun shots ringing out.   Koerte Decl. ¶ 10-16.   Another neighbor, Robert Jordan, saw Louis on the roof, wearing only a pair of shorts, walking toward the street with a bamboo pole in his hand.   Jordan then turned away from his window and heard gun shots. Jordan Decl.¶ 10-14.

James Louis, a neighbor and Louis' grand-nephew, recounted the incident as follows:

9. When I saw Uncle Dickie on the roof, he had bamboo poles in his hand and he tossed them onto the driveway.

10. The bamboo poles that he threw were rotten.

11. There were police officers standing in front of the house out in the open.

12. Everyone could see that Uncle Dickie had no weapons on him.

13. After he tossed the bamboo poles off the roof, Uncle Dickie's hands were empty.

14. He had nothing on his person other than his shorts.

15. I then saw Uncle Dickie moving back toward the middle of the roof.

16. From where I was standing, I could see Uncle Dickie the entire time from when he tossed the bamboo poles off the roof until he was shot.

17. Uncle Dickie was shot almost immediately after he tossed the bamboo poles to the ground and turned around.

18. His hands were still empty.

19. From where I was standing, if Uncle Dickie had leaned down or bent down to pick something up from the roof, I would have lost [sight] of him. However, I did not lose

7

[sight] of him from the time he turned around until the time he was shot.

20.     I then heard Uncle Dickie get shot and I heard him fall.

21.     I find it hard to believe Uncle Dickie had time to pick up anything after he tossed the bamboo poles to the ground and before he was shot and killed by the police officer, as the whole thing happened in a matter of seconds.

James Louis Decl.

## II.     **Plaintiffs' Claims**

According to Plaintiffs, Louis was non-violent and non-threatening, and Calio's use of excessive force was avoidable.   They insist that Louis never had a hammer[1] or any other sharp or shiny metal object on the roof and did not threaten Calio before he was shot.

Plaintiffs emphasize that, during the HFTF operation, KPD's highest ranking officers, including KPD Chief of Police Darryl Perry, Assistant Chief of Police Roy Asher, Assistant Chief of Police Ali Quibilan, and Acting Chief of Police

---

[1]KPD Officer James Rodriguez recovered a hammer from the rear area of the kennels in the days subsequent to the incident.   The hammer was swabbed for DNA, but the samples were not tested because of the expense and the absence of a criminal case.   Rodriguez Decl. ¶¶4-10.   Plaintiffs claim that the hammer found by Rodriguez was rusted and could not have been the shiny object on the roof that Calio claimed to have seen in Louis' hand.   Moreover, they assert that Louis kept the rusted hammer near his flower beds where he used it as a makeshift gardening tool. Lisa Louis Decl. ¶¶ 9-15.

Michael Contrades, were either suspended, on administrative leave, or otherwise out of state. FAC ¶ 15. They also contend that Perez improperly delegated his role as Incident Commander to Barriga, who had no experience in barricaded suspect negotiations and had never been an Incident Commander. According to Plaintiffs, Barriga's decision to initiate a tactical response was made without consulting Officer Resinto, KPD's primary negotiator, and precipitated Louis' death. Plaintiffs' Ex. 4 (Van Blaricom Report).[2]

Plaintiffs Richard C. Lewis, Derrick Louis, Kevin Louis, and Lynell Tokuda are Louis' adult children. Tokuda is named both individually and as personal representative of the Louis Estate. Plaintiffs allege claims against KPD Officers Calio, Barriga, and Perez in their individual and official capacities, as well as against the County of Kauai. Count I alleges assault and battery against Calio in his individual and official capacity. Count II alleges 42 U.S.C. § 1983 violations against Calio in his individual capacity, and Count III alleges 42 U.S.C. § 1983 violations against the County, and Calio, Barriga, and Perez individually. Count IV alternatively alleges negligent training and/or supervision against the County, Barriga and Perez. Plaintiffs' remaining claims are alleged against all Defendants:

---

[2]Barriga prepared a report on the incident, but KPD has been unable to produce it. Plaintiffs'

negligence (Count V); intentional infliction of emotional distress ("IIED") (Count VI); negligent infliction of emotional distress ("NIED") (Count VII); and wrongful death/loss of consortium under Hawaii Revised Statutes ("HRS") § 663-3 (Count VIII).   Count IX seeks punitive damages against Calio, Barriga, and Perez only.

The County seeks judgment on the pleadings or summary judgment on Counts I, III, IV, V, VI, VII, and VIII, and on all Counts against Calio in his official capacity as duplicative of the non-viable claims against the County.   Calio, in his individual capacity, seeks summary judgment on Counts I, II, III, V, VI, VII, VIII, and IX.

## STANDARD OF REVIEW

Pursuant to Federal Rule of Civil Procedure 56(a), a party is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

## DISCUSSION

### I.   Calio Motion for Summary Judgment

The Court first addresses Calio's motion for summary judgment on the claims brought against him in his individual capacity,

---

Ex. 13 (12/18/13 Letter).

**A.** <u>**Section 1983 Claims Against Calio Indivdually (Counts II & III)**</u>

Under 42 U.S.C. § 1983,

Every person who, under color of any statute, ordinance, regulation, custom, or usage . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . .

Plaintiffs allege that Calio violated Louis' rights under the Fourth, Eighth, and Fourteenth Amendments to the United States Constitution, and civil liberties protected by the Hawaii State Constitution. FAC ¶¶ 101, 114-115.

**1.** <u>**Hawaii State Constitution**</u>

Section 1983 is a vehicle for redress of violations of federal law. A claim for violation of state law is not cognizable under the statute. *Cornejo v. County of San Diego*, 504 F.3d 853, 855 n.3 (9th Cir. 2007) (citing *Campbell v. Burt*, 141 F.3d 927, 930 (9th Cir. 1998)) ("We note that a claim for violation of state law is not cognizable under § 1983."); *Alston v. Read*, 678 F. Supp. 2d 1061, 1074 (D. Haw. 2010) (citing *Moreland v. Las Vegas Metro. Police Dep't*, 159 F.3d 365, 371 (9th Cir. 1998)) ("Section 1983 is a remedy for violations of certain federal rights. Violations of state law (including a state constitution), however, are not cognizable

under Section 1983."), reversed on other grounds, 663 F.3d 1094 (9th Cir. 2011). To the extent Plaintiffs assert Section 1983 claims based on violations of the Hawaii State Constitution, those claims fail as a matter of law.

## 2. Eighth Amendment

To the extent Plaintiffs allege a violation of the Eighth Amendment, their claim also fails. "In addressing an excessive force claim brought under § 1983, the analysis begins by identifying the specific constitutional right allegedly infringed [upon] by the challenged application of force." *Graham v. Connor*, 490 U.S. 386, 394 (1989) (citing *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)). The validity of the claim must then be determined by reference to the constitutional standard which governs the right, rather than to a more generalized excessive force standard. *Id.*; *compare Tennessee v. Garner*, 471 U.S. 1 (1985) (applying the Fourth Amendment standard to a claim of excessive force to effect an arrest), with *Whitley v. Albers*, 475 U.S. 312 (1986) (applying the Eighth Amendment standard to a claim of excessive force to subdue a convicted prisoner), with *White v. Roper*, 901 F.2d 1501, 1507 (9th Cir. 1990) (applying the Fourteenth Amendment's Substantive Due Process standard to a claim of excessive force against a pretrial

detainee).   The custodial status of the victim determines the applicable

constitutional amendment.   *See Graham*, 490 U.S. at 393-94.

Here, Louis was not a prisoner or pretrial detainee at the time of the incident.

The Fourth Amendment's objective reasonableness standard governs Section 1983

claims based on excessive force during the "arrest, investigatory stop, or other

'seizure' of a free citizen."   *See Graham*, 490 U.S. at 394.[3]   Accordingly, Louis'

status does not support an Eighth Amendment claim.

### 3.   Fourth Amendment

As a preliminary matter, Plaintiffs individually cannot bring Section 1983

claims against Defendants based on violations of Louis' Fourth Amendment rights.

 *See Rakas v. Illinois,* 439 U.S. 128, 133-34 (1978); *Smith v. City of Fontana*, 818

F.2d 1411, 1417 (9th Cir. 1987), overruled on other grounds by *Hodgers–Durgin

v. de la Vina*, 199 F.3d 1037 (9th Cir. 1999) ("Smith's children, suing in their

individual capacities, also assert a claim for relief under the Fourth

Amendment...The children were not directly subjected to the excessive use of state

force and therefore cannot maintain personal causes of action under section 1983 in

---

[3]A person is "seized" within the meaning of the Fourth Amendment if "by means of physical force or show of authority, his freedom of movement is restrained."   *United States v. Mendenhall*, 446 U.S. 544, 553 (1980).

reliance on this Fourth Amendment theory.").   Louis' Fourth Amendment rights were personal to him and may be asserted, if at all, only by his estate.   *See Moreland v. Las Vegas Metro. Police Dep't*, 159 F.3d 365, 369 (9th Cir. 1998); *Smith*, 818 F.2d at 1416-17.   Accordingly, only Tokuda, in her capacity as personal representative of the Louis Estate, may assert such a claim.

Calio urges the Court to enter judgment on his behalf on the Fourth Amendment claim based on qualified immunity because he had probable cause to use deadly force under the circumstances.   "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."   *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).

In determining whether an officer is entitled to qualified immunity, this Court employs a two-step test: "first we decide whether the officer violated a plaintiff's constitutional right; if the answer to that inquiry is 'yes,' we proceed to determine whether the constitutional right was 'clearly established in light of the specific context of the case' at the time of the events in question."   *Mattos v. Agarano*, 661 F.3d 433, 440 (9th Cir. 2011) (en banc).   Here, the Court must

consider whether Calio violated Louis' Fourth Amendment rights. The Supreme Court "has emphasized that there are no per se rules in the Fourth Amendment excessive force context; rather, courts must still slosh [their] way through the factbound morass of 'reasonableness.' Whether or not [a defendant's] actions constituted application of 'deadly force,' all that matters is whether [the defendant's] actions were reasonable." *Id.* at 433 (citation omitted).

Under the Fourth Amendment, "officers may only use such force as is 'objectively reasonable' under the circumstances." *See Jackson v. City of Bremerton,* 268 F.3d 646, 651 (9th Cir. 2001) (quoting *Graham v. Connor*, 490 U.S. 386, 397 (1989)). To determine whether the force used was reasonable, courts balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 397.

Determining whether a police officer's use of force was reasonable or excessive "requires careful attention to the facts and circumstances of each particular case" and a "'careful' balancing of an individual's liberty with the government's interest in the application of force." *Santos v. Gates*, 287 F.3d 846, 854 (9th Cir. 2002) (quoting *Graham*, 490 U.S. at 396). When evaluating the

nature and quality of the intrusion, the Court considers the "type and amount of force inflicted." *City of Bremerton*, 268 F.3d at 651-52 (quoting *Chew v. Gates*, 27 F.3d 1432, 1440 (9th Cir. 1994)). When evaluating the governmental interest in the use of force, courts examine three main factors: (1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat to the safety of the officers or others; and (3) whether he is actively resisting arrest or attempting to evade arrest by flight. *Bryan v. MacPherson*, 630 F.3d 805, 825 (9th Cir. 2010).[4] Here, Louis was clearly attempting to evade arrest. The parties dispute the severity of the crime and whether Louis posed an immediate threat to the safety of the officers or others.

The "most important" of these factors is whether the suspect posed an "immediate threat to the safety of the officers or others." *Smith v. City of Hemet*, 394 F.3d 689, 702 (9th Cir. 2005). In determining whether there was an immediate threat, a "simple statement by an officer that he fears for his safety or the safety of others is not enough; there must be objective factors to justify such a concern." *Mattos*, 661 F.3d at 441-42.

---

[4]These three factors are not exclusive. Courts may also examine the "totality of the circumstances" and "whatever specific factors may be appropriate in a particular case." *Bryan*

Here, Calio avers that Louis was charging toward him with an "angry and violent look on his face" and raised a hammer over the right side of his head "as if to either throw the hammer at me or strike me with it," while quickly closing the distance between them. Calio Decl. ¶¶ 26, 37-38. According to Calio, Louis yelled, "I going to fucking kill you." Calio Decl. ¶ 42. Calio claims that he feared for his life, believing that he was going to be struck in the face or head with the hammer. Calio Decl. ¶ 43. Kalima's account of the incident supports Calio's view. Kalima claims that he saw Louis with a hammer in his right hand, raised above his hand in a cocked back position, while running toward Calio. Kalima Decl. ¶¶ 17-19. According to Kalima, Louis threw the hammer at Calio, causing Calio to fire his weapon in response. Kalima Decl. ¶ 20-21.

Thus, in Defendants' version of the incident, Louis was warned several times to give up, Louis failed to comply with each command, Louis threw metal cages and bamboo poles from the roof down onto the officers below, Louis actively resisted Calio's attempt to apprehend him, Louis threatened to kill Calio, Louis charged at Calio with a hammer that he pulled out of a can on the roof, and Louis threw the hammer at Calio as the officer approached. If believed by the

_v. MacPherson_, 630 F.3d 805, 825 (9th Cir. 2010) (quoting _Franklin v. Foxworth_, 31 F.3d 873,

trier of fact, this version of events could surely support a finding that Calio's use of

force was reasonable under the circumstances.   *See, e.g., Sheehan v. City & Cnty.*

*of San Francisco*, 743 F.3d 1211, 1229 (9th Cir. 2014) (holding that officer was

entitled to qualified immunity where undisputed facts showed that the plaintiff

threatened to kill the officer, wielded a knife in an upraised position, advanced

toward the officer, did not drop the knife after being pepper sprayed, and got to

within only a few feet of the officer before being shot); *Blanford v. Sacramento*

*Cnty.*, 406 F.3d 1110, 1119 (9th Cir. 2005) (officers reasonably believed that

victim armed with Civil War-era sword posed a serious danger to officers and

bystanders "because he failed to heed warnings or commands and was armed with

an edged weapon that he refused to put down."); *Reynolds v. Cnty. of San Diego*,

84 F.3d 1162, 1168 (9th Cir. 1996), overruled on other grounds by *Acri v. Varian*

*Assocs., Inc.*, 114 F.3d 999 (9th Cir. 1997) (holding that deadly force was

reasonable where a suspect, who had been behaving erratically, swung a knife at an

officer); *Garcia v. United States*, 826 F.2d 806, 812 (9th Cir. 1987) (holding that

deadly force was reasonable where the decedent attacked an officer with a rock and

stick).

---

876 (9th Cir. 1994)).

The facts, however, are sharply disputed.  Plaintiffs contend that Louis was trapped on the roof, wearing only his shorts, and that he was neither violent nor a flight risk.  Their contention that he was neither violent nor a flight risk is lent some support by the fact that dozens of officers were apparently in the immediate area of Louis' home at the time of the shooting and that Louis was on foot (barefoot) practically surrounded with nowhere to go.[5]  The declarations of witnesses Rose Koerte, Robert Jordan, and James Louis assert generally that Louis had a slight-build that was non-threatening.  Most significantly, Plaintiffs present evidence that Louis did not have a hammer or any other weapon in his hands as he moved along the roof before he was shot.  According to James Louis, he could see Louis from the time that he tossed the bamboo poles off the roof until he was shot, which occurred within a matter of seconds.  He clearly states that Louis was shot almost immediately after he tossed the bamboo poles to the ground and turned around, and that his hands were empty.  James Louis states that he did not lose sight of Louis from the time he turned around until the time he was shot.  James Louis Decl. ¶¶ 16-21.  Even law enforcement declarant Oliveira did not observe

---

[5]Of course, it is difficult to conclude there was no evidence of Louis' violence, given the undisputed testimony that Louis threw poles and metal cages from the roof onto the areas occupied below by law enforcement personnel.

anything in Louis' hands at the time he was shot, in stark contrast to the statements of Calio and Kalima.   Plaintiffs' Ex. 11.

If a trier of fact believed the version of events set forth in James Louis' Declaration, he or she could surely and rationally find that Louis did not pose an immediate safety threat to Calio or anyone else.   Accordingly, a reasonable jury could find that Calio violated the decedent's clearly established Fourth Amendment rights by seizing an unarmed, aged, slight, nearly naked, non-dangerous civilian surrounded by numerous law enforcement personnel by shooting him dead.   *See, e.g.*, *Torres v. City of Madera*, 648 F.3d 1119, 1128 (9th Cir. 2011) (citing *Garner*, 471 U.S. at 11) ("While locating the outer contours of the Fourth Amendment may at times be a murky business, few things in our case law are as clearly established as the principle that an officer may not 'seize an unarmed, nondangerous suspect by shooting him dead' in the absence of 'probable cause to believe that the fleeing suspect poses a threat of serious physical harm, either to the officer or to others.'"); *Curnow v. Ridgecrest Police*, 952 F.2d 321, 324-25 (9th Cir. 1991) (holding that deadly force was unreasonable where the suspect possessed a gun but was not pointing it at the officers and was not facing the officers when they shot); *Ting v. United States*, 927 F.2d 1504, 1511 (9th Cir.

1991) ("A jury could reasonably conclude that it would not be reasonable for an officer to believe the use of deadly force was lawful under [arrestee's] version of the shooting, i.e., an unarmed and injured felon lying or kneeling on the floor[.]"); *Duenez v. City of Manteca*, 2013 WL 6816375, at *9-*10 (E.D. Cal. Dec. 23, 2013) (Finding "that it was clearly established at the time of the shooting that it was a Fourth Amendment violation to seize an unarmed, non-dangerous civilian by shooting him dead," where "the video of the shooting shows that there may be something briefly in decedent's hand, but it is not clear beyond reasonable dispute that it is a knife, or a weapon of any kind.").

The Court acknowledges that it "must allow for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving about the amount of force that is necessary in a particular situation." *Ogden ex rel. Estate of Ogden v. Cnty. of Maui*, 554 F. Supp. 2d 1141, 1148 (D. Haw. 2008) (quoting *Long v. City & Cnty. of Honolulu*, 511 F.3d 901, 906 (9th Cir. 2007)). Even considering the objectively tense, rapidly evolving scenario on the rooftop, when viewed in the light most favorable to Plaintiffs, there are disputed material facts surrounding whether Louis possessed a weapon and posed an immediate threat to the safety of Calio and the other

officers.   Under the circumstances, the Court cannot determine whether the force employed by Calio was reasonable as a matter of law.

Whether Calio's conduct violated a clearly established constitutional right by subjecting Louis to excessive force turns on issues of fact that are in dispute, including the circumstances of the shooting, and specifically, whether Louis charged at Calio with hammer in his hand and/or threw the hammer at Calio. After considering the severity of the force used, the basic *Graham* factors, and the totality of the circumstances, the Court finds that a genuine issue of fact exists as to whether Louis posed an immediate threat to the safety of the officers sufficient to warrant the use of deadly force.   Accordingly, the Court cannot determine whether Calio's conduct was reasonable as a matter of law.   Nor can the issue of whether Calio is entitled to qualified immunity be resolved as a matter of law in light of the factual conflict surrounding the circumstances of the shooting.   The Court DENIES Calio's motion with respect to the Section 1983 claim for violation of Louis' Fourth Amendment rights.

### 4.    Fourteenth Amendment

#### a.    Substantive Due Process

Plaintiffs individually may bring claims under the Fourteenth Amendment's substantive due process analysis.    The Ninth Circuit has recognized that family members have a Fourteenth Amendment liberty interest in familial companionship and society.    *Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010) (citing *Curnow ex rel. Curnow v. Ridgecrest Police*, 952 F.2d 321, 325 (9th Cir. 1991)).

A substantive due process violation requires that law enforcement officers' conduct "shock the conscience."    *Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008).    In determining whether excessive force shocks the conscience, the Court must first ask "whether the circumstances are such that actual deliberation [by the officer] is practical."    *Id.* (quoting *Moreland v. Las Vegas Metro. Police Dep't*, 159 F.3d 365, 372 (9th Cir. 1998) (internal quotation marks omitted)).    Where actual deliberation is practical, then an officer's "deliberate indifference" may suffice to shock the conscience.    *Id.*    On the other hand, where, as here, a law enforcement officer makes a snap judgment because of an escalating situation, his conduct may be found to shock the conscience only if he acts with a purpose to harm unrelated to legitimate law enforcement objectives.    *Id.* at 1140.    For

example, a purpose to harm might be found where an officer uses force to "teach [a suspect] a lesson" or to "get even." *Id.* at 1141.

Here, there is no evidence that Calio had any intent to cause harm to Louis beyond performing his legitimate law enforcement duties. This conclusion is supported by the absence of any relationship between Calio and Louis prior to February 15, 2012, as well as Calio's repeated verbal commands that day, which demonstrate an intent to apprehend Louis without serious harm or injury. Regardless of whether Calio's ultimate decision to use deadly force was reasonable, his actions do not demonstrate a purpose to cause harm that would "shock the conscience" sufficient to implicate the Due Process Clause. Accordingly, Calio is entitled to summary judgment on Plaintiffs' Fourteenth Amendment due process claim.

### b.    Equal Protection

To the extent Plaintiffs allege a violation of the Fourteenth Amendment's Equal Protection Clause, they fail to state a claim. To state a claim under 42 U.S.C. § 1983 for a violation of the Equal Protection Clause of the Fourteenth Amendment, a plaintiff must show that a defendant acted with an intent or purpose to discriminate against the plaintiff based on membership in a protected class. *See*

*Barren v. Harrington*, 152 F.3d 1193, 1194 (9th Cir. 1998) ("[A] plaintiff must show that the defendants acted with an intent or purpose to discriminate against the plaintiff based upon membership in a protected class."); *Damiano v. Florida Parole & Probation Comm'n*, 785 F.2d 929, 932–33 (11th Cir. 1986) (explaining that protected classes include race, religion, national origin, and poverty).   The First Amended Complaint contains no allegations that Calio discriminated against Louis based on his membership in a protected class, nor do Plaintiffs offer any evidence of such discrimination.   Plaintiffs also do not allege that they themselves are members of a protected class or that they were treated differently based on such membership.   Calio is entitled to summary judgment on this claim.

## B.    State Law Claims

Calio seeks summary judgment on the state law tort claims asserted against him individually.   Under Hawai'i law, non-judicial government officials have a qualified or conditional privilege with respect to their tortious actions taken in the performance of their public duties.   *Towse v. State of Hawaii*, 64 Haw. 624, 631, 647 P.2d 696, 702 (1982)); *see also Medeiros v. Kondo*, 55 Haw. 499, 504, 522 P.2d 1269, 1272 (1974).   There is no dispute here that Calio's allegedly tortious

conduct occurred while he was performing his public duties as a police officer. *See* FAC ¶ 12.

Government officials, however, are not entitled to immunity when a plaintiff "demonstrate[s] by clear and convincing proof that those officials were stirred by malice and not by an otherwise proper purpose." *Towse*, 64 Haw. at 631, 647 P.2d at 702. Malice is defined as "the intent, without justification or excuse, to commit a wrongful act, reckless disregard of the law or of a person's legal rights, and ill will; wickedness of heart." *Awakuni v. Awana*, 115 Hawai'i 126, 141, 165 P.3d 1027, 1042 (2007) (quoting Black's Law Dictionary 976 (8th ed. 2004)) (internal quotation marks omitted).

Because malice involves intent, reckless disregard, or ill will, the malice requirement is "incompatible with a claim based on negligence." *Bartolome v. Kashimoto*, 2009 WL 1956278, at *2 (D. Haw. 2009). Accordingly, Calio is entitled to summary judgment on Plaintiffs' claims for negligence (Count V) and negligent infliction of emotional distress (Count VII).

With respect to the remaining tort claims for assault and battery (Count I), intentional infliction of emotional distress (Count VI), and wrongful death/loss of consortium (Count VIII), Plaintiffs point to nothing in the record that raises a

26

genuine issue of fact as to whether Calio was motivated by malice, rather than by a desire to protect other officers and himself. *See Edenfield v. The Estate of Willets,* 2006 WL 1041724, at *12 (D. Haw. April 14, 2006) ("For a tort action to lie against a nonjudicial government official, the injured party must allege and *demonstrate by clear and convincing proof* that the official was motivated by malice and not by an otherwise proper purpose. When a public official is motivated by malice, and not by an otherwise proper purpose, Hawaii law provides that the cloak of immunity is lost and the official must defend the suit the same as any other defendant.") (citations omitted, emphasis added).

To be clear, Plaintiffs offer nothing more than the legal conclusion that Calio acted with malice. *See* Mem. in Opp. at 35-36; *Haldeman v. Golden, 2008 WL 1744804,* at *13 (D. Haw. Apr. 16, 2008) ("[T]he issue of malice is appropriate for determination by the court if the evidence surrounding a claim for malice is uncontroverted."). Because there is no *evidence* of malice, Calio is entitled to a qualified privilege under state law, mandating summary judgment on these claims.

## C.    **Summary**

In sum, Calio in his individual capacity is entitled to summary judgment on the following claims: assault and battery (Count 1); Section 1983 claims for

violation of the Hawaii Constitution, and the Eighth and Fourteenth Amendments to the United States Constitution (Counts II & III); negligence (Count V); IIED (Count VI); NIED (Count VII), and the derivative claim for Wrongful Death/Loss of Consortium (Count VIII).

Questions of fact preclude summary judgment on the Section 1983 claim brought by Tokuda, in her capacity as personal representative of Louis' estate, for excessive force in violation of the Fourth Amendment (Counts II & III).   The associated prayer for punitive damages for this claim remains as well.[6]

## II.   __County Motion for Summary Judgment__

The County seeks summary judgment on all claims against Calio in his official capacity, the *respondeat superior* state law claims based on Calio's conduct, the Section 1983 municipal liability claim (Count III), negligent training and/or supervision (Count IV), and the derivative claim for Wrongful Death/Loss of Consortium (Count VIII).

---

[6]With respect to Count IX, a request for punitive damages is not a stand-alone claim, but rather derivative of Plaintiffs' other claims.   *See Kang v. Harrington*, 59 Haw. 652, 660, 587 P.2d 285, 291 (1978) ("An award of punitive damages is purely incidental to the cause of action.").   To the extent Plaintiffs seek punitive damages as a stand-alone claim (Count IX), the Count is dismissed as to the state law tort claims, but is still available with respect to the remaining Section 1983 claim.   *See Graham*, 473 U.S. at 167 n.13 (1985) (Although Section 1983 does not permit punitive damages against a municipality, punitive damages are available against an official individually.).

### A.  Claims Based Upon Calio's Conduct

The Court first addresses the claims against Calio in his official capacity and the *respondeat superior* claims against the County.

### 1.  Official Capacity Claims

The claims against Calio in his official capacity are redundant because the County is also a named defendant.   According to the Supreme Court, "[t]here is no longer a need to bring official-capacity actions against local government officials, for . . . local government units can be sued directly for damages and injunctive or declaratory relief."   *Kentucky v. Graham*, 473 U.S. 159, 167 n.14 (1985); *see also Monell v. Dep't of Social Servs.*, 436 U.S. 658, 690 n.55 (1978) (stating that "official capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent.").   As such, the official-capacity claims duplicate the claims asserted against the County of Kauai and are therefore dismissed.   *See Wong v. City & Cnty. of Honolulu*, 333 F. Supp. 2d 942, 947 (D. Haw. 2004).

### 2.  *Respondeat Superior* Claims

To recover under a *respondeat superior* theory, Plaintiffs must establish: (1) a negligent act of the employee (breach of a duty that is the legal cause of injury)

(2) that occurred within the employee's scope of employment. *Henderson v. Professional Coatings Corp.*, 72 Haw. 387, 391-92, 819 P.2d 84 (1991). Plaintiffs fail to do so here. Because the Court concludes that Calio is entitled to the state law qualified/conditional privilege, his employer, the County, cannot be liable under the doctrine of *respondeat superior*. *See McCormack v. City & Cnty. of Honolulu*, 2014 WL 692867, at *3 (D. Haw. Feb. 20, 2014) (internal citations and quotations omitted) (dismissing *respondeat superior* claims against City where no tort claims remained against individual officers). Accordingly, the County is entitled to summary judgment on these claims.[7]

### B. Municipal Liability Claim Against the County (Count III)

For the reasons discussed above with respect to Calio in his individual capacity, the Section 1983 claim against the County fails to state a claim to the extent it relies on violations of the Hawaii Constitution and the Eighth Amendment, and is accordingly dismissed. The Court next turns to the claim for

_____

[7]The present ruling applies to the *respondeat superior* claims against the County based on Calio's conduct only. To the extent Plaintiffs allege tortious conduct by Perez and Barriga in their individual capacities, those claims are not addressed by the instant motions. Accordingly, the County remains subject to *respondeat superior* liability to the extent there are remaining tort claims against these other officers. *See Freeland v. County of Maui*, 2013 WL 6528831, at *25 (D. Haw. Dec. 11, 2013) ("Because the individual line officers are all entitled to the qualified/conditional privilege, *respondeat superior* liability may only be based on the torts

municipal liability against the County based on an official-capacity *Monell* theory

of liability under the Fourteenth Amendment.

A plaintiff may establish *Monell* liability by showing at least one of the

following:

> (1) conduct pursuant to an official policy inflicted the injury;
> (2) the constitutional tort was the result of a "longstanding
> practice or custom which constitutes the standard operating
> procedure of the local government entity;" (3) the tortfeasor
> was an official whose acts fairly represent official policy such
> that the challenged action constituted official policy; or (4) an
> official with final policy-making authority "delegated that
> authority to, or ratified the decision of, a subordinate."

*Price v. Sery*, 513 F.3d 962, 966 (9th Cir. 2008).

Plaintiffs allege that the County is liable under Section 1983 for failing to

properly train and supervise its officers, which amounts to deliberate indifference

to Louis' rights.   FAC ¶¶ 93-100.   In Count III, Plaintiffs allege:

> 119.   The constitutional violations committed by Defendants
> CALIO, BARRIGA and PEREZ were the result of
> Defendant COUNTY OF KAUAI's deliberate failure to
> properly train and supervise its officers in handling,
> dealing with and/or taking custody of suspects and
> arrestees who appear to be noncooperative and refuse to
> come out of their homes, a situation that KPD Officers
> encounter regularly.

---

allegedly committed by the remaining individual officer defendants, Officers Bigoss and
Perkett.").

120.    Defendant COUNTY OF KAUAI is tasked with properly
        equipping KPD Officers with the needed non-deadly
        force technologies available that would allow KPD
        Officers to maintain their own safety and be able to
        subdue suspects and arrestees without causing their
        deaths.

121.    The actions of Defendants CALIO, BARRIGA, PEREZ
        and the rest of the law enforcement personnel on the
        scene was the result of inadequately trained and
        supervised KPD Officers attempting to handle
        negotiations with an arrestee barricaded on his property.
        Every action taken by the insufficiently trained KPD
        Officers was inappropriate to the situation and caused the
        encounter to be escalated.

122.    The supervising KPD Officers – e.g. BARRIGA, PEREZ
        – that arrived on the scene were also insufficiently
        trained and could not and did not properly supervise the
        situation, resulting in the supervising KPD Officers
        taking actions and giving directives that resulted in the
        death of MR. LOUIS.

FAC ¶¶ 119-22.

Liability may only be imposed for failure to train when that
failure "reflects a 'deliberate' or 'conscious' choice by a
municipality." *Canton*, 489 U.S. at 389, 109 S.Ct. 1197.
Further, failure to train claims "can only yield liability against a
municipality where that city's failure to train reflects deliberate
indifference to the constitutional rights of its inhabitants." *Id.*
at 392, 109 S.Ct. 1197. Given these restrictions on municipal
liability, a plaintiff seeking to impose liability against a county
for failure to train must show: "(1) [A]n inadequate training
program, (2) deliberate indifference on the part of the County in

adequately training its law enforcement officers, and (3) [that] the inadequate training 'actually caused' a deprivation of [a plaintiff's] constitutional rights." *Merritt v. County of L.A.*, 875 F.2d 765, 770 (9th Cir. 1989); *see also Gibson v. County of Washoe*, 290 F.3d 1175, 1194 (9th Cir. 2002) (setting forth a similar three-prong test) (citation omitted).

*Wereb v. Maui Cnty.*, 727 F. Supp. 2d 898, 921 (D. Haw. 2010) (footnote omitted).

Municipal liability may be imposed when "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *Canton*, 489 U.S. at 390; *see also Bd. of County Comm'rs v. Brown*, 520 U.S. 397, 407-09 (1997) (explaining that deliberate indifference may be shown through a "pattern of tortious conduct by inadequately trained employees" or where "a violation of federal rights may be a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations"). In the municipal context, deliberate indifference is an objective standard. *See Gibson*, 290 F.3d at 1187 n.8 (explaining that the objective standard "assigns liability even when a municipality has constructive notice that it needs to remedy its omissions in order to avoid violations of constitutional rights") (citations omitted).

In light of the above standards, Plaintiffs' Section 1983 claims against the County must fail. Plaintiffs raise no genuine issue of material fact that County policymakers had actual or constructive notice that its officer training was deficient. "Only where a failure to train reflects a deliberate or conscious choice by the municipality . . . can a city be liable for such a failure under § 1983." *Canton*, 489 U.S. at 389; *see also Connick v. Thompson*, 131 U.S. 1350, 1360 (2011) ("A pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train.").

In the face of the County's formal policies on the use of force (*see* County Exs. 22 & 23), Plaintiffs fall short of establishing any "informal policy" or "widespread practices" sufficient to survive summary judgment. *See Hunter v. Cnty. of Sacramento*, 652 F.3d 1225, 1234 (9th Cir. 2011). To the extent Plaintiffs contend that KPD operated without a "Hostage Negotiation Policy," they provide no authority that the County was required to implement one, or that KPD's training was inadequate without one under the circumstances. *Cf.* County Reply Ex. 1 (Resinto Dep. Tr.); Ex. 3 (Perry Dep. Tr.). Significantly, Plaintiffs provide no evidence that the County was aware of prior incidents in which constitutional

rights were similarly violated and made a conscious choice to ignore the incidents, nor do they allege any other program-wide deficiency in training.  *See Blankenhorn v. City of Orange*, 485 F.3d 463, 484 (9th Cir. 2007).

Plaintiffs instead focus on (1) KPD Chief Perry's purported ratification of Calio's allegedly unconstitutional actions and (2) Mayor Bernard Carvalho's decision to go forward with the HFTF arrest warrant sweep as official County policy.   Neither provides sufficient grounds to maintain a *Monell* claim against the County.

With respect to ratification, Plaintiffs "must show the decision was the product of a conscious, affirmative choice to ratify the conduct in question.   Such a ratification 'could be tantamount to the announcement or confirmation of a policy for purposes of *Monell*.'"   *Edenfield*, 2006 WL 1041724, at *16 (quoting *Haugen v. Brosseau*, 339 F.3d 857, 875 (9th Cir. 2003), *reversed on other grounds by Brosseau v. Haugen*, 543 U.S. 194 (2004) (per curiam)).   *See also Christie v. Iopa*, 176 F.3d 1231, 1239 (9th Cir. 1999) (ratification requires proof of a policymaker's knowledge of the alleged constitutional violation); *Trevino v. Gates*, 99 F.3d 911, 920 (9th Cir. 1996) (ratification requires an adoption and express approval of the acts of others who caused the constitutional violation); *Gillette v. Delmore*, 979

F.2d 1342, 1348 (9th Cir. 1992) (an official policymaker must "make a deliberate choice from among various alternatives to follow a particular course of action").

Here, there is no evidence that Chief Perry deliberately chose to "endorse" Calio's conduct and the basis for it, which must occur "before the policymaker will be deemed to have ratified the subordinate's discretionary decision." *Gillette*, 979 F.2d at 1348. A mere failure "to overrule the unconstitutional discretionary acts of subordinates[,]" without expressly endorsing or approving of the conduct, is an insufficient predicate for the imposition of liability against the municipality. *Id.* Nor do Plaintiffs offer any evidence that the alleged ratification was accompanied by extenuating or egregious circumstances. By "signing off on the Internal Affairs investigation," Perry cannot be said to have "ratified" any unconstitutional conduct. *See* Mem. in Opp at 25-27 ("Chief Perry affirmatively signed off on the Internal Affairs investigation deeming Calio's conduct appropriate."). There must exist "something more" than the mere evidence "that a policymaker concluded that the defendant officer's actions were in keeping with the applicable policies and procedures." *Garcia v. City of Imperial*, 2010 WL 3911457, at *2 (S.D. Cal. 2010) (citing *Kanae v. Hodson*, 294 F. Supp. 2d 1179, 1191 (D. Haw. 2003) and *Larez v. City of Los Angeles*, 946 F.2d 630, 646-648 (9th Cir. 1991)).

With respect to Plaintiffs' argument that Mayor Carvalho had actual or constructive notice that "training was necessary for the remaining KPD personnel," because the top four KPD personnel were unavailable during the HFTF operation, they fail to meet their burden in opposition to summary judgment. *See* Mem. in Opp at 28-29. As discussed previously, there are no allegations or evidence of a program-wide deficiency or omission in KPD's training program. Plaintiffs' conclusory allegation that Carvalho did "nothing to fix the situation – e.g. making sure the remaining leadership personnel of KPD were adequately trained" fails to raise a genuine issue of material fact. *See* Mem. in Opp. at 29. There is no evidence that Carvalho made a deliberate choice from among various alternatives to go forward with the HFTF operation despite an inadequate police-wide training program. Without anything more, Plaintiffs fail to identify a genuine dispute of material fact regarding their allegations that the County has a deficient training program or that the County demonstrated deliberate indifference to the training deficiencies.

In sum, the County is entitled to summary judgment on each of Plaintiffs' Section 1983 theories (Count III).

## C.    Negligent Training and/or Supervision (Count IV)

Under Hawaii law, a claim for negligent supervision "may only be found where an employee is acting *outside* of the scope of his or her employment[.]" *Dairy Rd. Partners v. Island Ins. Co., Ltd*., 92 Hawai'i 398, 427, 992 P.2d 93 (2000) (emphasis in original); *see also Wong–Leong v. Hawaiian Indep. Refinery, Inc*., 76 Hawai'i 433, 444-45, 879 P.2d 538 (1994) (adopting the test for negligent supervision set forth in the Restatement (Second) of Torts § 317, requiring that the employee be acting outside the scope of his employment).   Plaintiffs do not present evidence that Calio or the other task force officers were acting outside the scope of their employment.   Indeed, they allege the officers were acting *within* the scope of their employment and under color of law when they conducted the HFTF operation on February 15, 2012.   *Cf*. FAC ¶¶ 4-6.

Nor is there any evidence that Calio, or any other officer, required a greater degree of control or supervision.   *See Otani v. City & Cnty. of Haw*., 126 F. Supp. 2d 1299, 1308 (D. Haw. 1998) ("Under Hawaii law, before a plaintiff can establish a claim for negligent training and/or supervision, the plaintiff must establish that 'the employer knew or should have known of the necessity and opportunity for exercising such control.'   *Abraham v. S.E. Onorato Garages*, 50

Haw. 628, 639, 446 P.2d 821, 826 (1968). . . . If an employer has not been put on notice of the necessity for exercising a greater degree of control or supervision over a particular employee, the employer cannot be held liable as a matter of law."). Accordingly, the County is entitled to summary judgment on Count IV.

### D. Wrongful Death/Loss of Consortium (Count VIII)

Finally, the County seeks summary judgment on Plaintiffs' loss of consortium claim pursuant to HRS § 663-3. In *Hara v. Island Insurance Co., Ltd.*, 70 Haw. 42, 759 P.2d 1374 (1988), the Hawaii Supreme Court held that claims for damages brought under Hawaii's wrongful death statute "are derivative and therefore, for purposes of tort liability, stand or fall with the claim of the person actually injured." *See also Mist v. Westin Hotels, Inc.*, 69 Haw. 192, 199, 738 P.2d 85, 91 (1987) ("[W]e refuse to recognize the loss of consortium claim as a separate and independent cause of action and continue to treat it as derivative."). Because Louis cannot maintain a claim against the County, the derivative HRS § 663-3 claim fails as well. The County is entitled to summary judgment on Count VIII.

### E. Summary

The County's Motion for Summary Judgment is GRANTED as to all claims.

## CONCLUSION

For the foregoing reasons, Calio's Motion for Summary Judgment is DENIED as to Counts II and III, to the extent that Tokuda, in her capacity as personal representative of Louis' estate, asserts a Section 1983 Fourth Amendment claim against Calio in his individual capacity. Defendants Calio and the County of Kauai's Motions for Summary Judgment are GRANTED in all other respects.

IT IS SO ORDERED.

DATED: October 30, 2014 at Honolulu, Hawai'i.



Derrick K. Watson
United States District Judge

---

*Tokuda v. Calio*, CIV. NO. 13-00202 DKW-BMK; ORDER (1) GRANTING IN PART AND DENYING IN PART CHRIS CALIO'S MOTION FOR SUMMARY JUDGMENT AND (2) GRANTING COUNTY OF KAUAI'S MOTION FOR SUMMARY JUDGMENT